2020 IL App (1st) 191871-U

No. 1-19-1871

Order filed June 23, 2020

Second Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| TRACEY J. ELLIS, | ) | Petition for Direct |
| | ) | Administrative Review of a |
| Petitioner-Appellant, | ) | Decision of the Illinois Human |
| | ) | Rights Commission |
| v. | ) | |
| | ) | |
| ILLINOIS HUMAN RIGHTS COMMISSION, ILLINOIS | ) | No. 2018 CP 1791 |
| DEPARTMENT OF HUMAN RIGHTS, and CHICAGO | ) | |
| ATHLETIC CLUBS, LLC, | ) | |
| | ) | |
| Respondents-Appellees. | ) | |

PRESIDING JUSTICE FITZGERALD SMITH delivered the judgment of the court. Justices Pucinski and Coghlan concurred in the judgment.

**ORDER**

¶ 1    *Held*:   We affirm the Illinois Human Rights Commission's order sustaining the Illinois Department of Human Rights' dismissal of petitioner's charge of discrimination for lack of substantial evidence.

¶ 2    Petitioner Tracey J. Ellis appeals *pro se* directly to this court from a final order entered by the Illinois Human Rights Commission (Commission) sustaining the Illinois Department of Human Rights' (Department) dismissal of her charge of public accommodation discrimination

against Chicago Athletic Clubs, LLC (CAC) pursuant to the Illinois Human Rights Act ("Act") (775 ILCS 5/1-101, *et seq.* (West 2016)). Petitioner contends the Commission erred by (1) "dismissing the evidence for refusing [her] membership, (i.e.) cited in the CAC white male management response to [her charge of discrimination]"; and (2) "failing to remand [her] charge, based on the [Department] investigator's negligence in fact-finding conference, (i.e.) allowing mediation extension request, that [she] never agreed." We affirm.

¶ 3     On March 19, 2018, petitioner filed a public accommodation discrimination charge, in which she alleged CAC denied her full and equal enjoyment of its facilities by denying her membership (1) because of her race, which she described as "black" (discrimination claim), and (2) in retaliation for complaining about discrimination (retaliation claim). The Department assigned an investigator, who interviewed petitioner and CAC's director of customer service, Kate Kreissl, during a fact-finding conference and thereafter prepared a report. The investigator's report indicated the following facts were presented at the conference.

¶ 4     CAC operated numerous membership-based health and fitness clubs in the Chicago area, including the Evanston Athletic Club (Evanston club) and Webster Athletic Club (Webster club).

¶ 5     Petitioner advised the investigator she had been a "past responsible guest" of CAC's facilities and, in June 2017, she purchased from Groupon a 30-day trial membership to the Webster club. In July 2017, she took advantage of another promotion for one-week access to the Evanston club. After the one-week promotion ended, she met with membership advisor, Kellen Strobel, a white male, who reviewed with her CAC's membership options and costs. Petitioner advised Strobel she could not afford a membership at the time due to her budget constraints, and Strobel

informed her CAC offers one-day guest passes. Thereafter, she occasionally purchased one-day passes and used them at the Evanston club.

¶ 6     In early March 2018, petitioner received an email from CAC, which contained a promotional offer that fit her budget. She called Strobel and set an appointment for March 14, 2018, to enroll in the offer. On March 6, 2018, petitioner received a phone call from Strobel. Strobel told her that it was noted in her file she had been disruptive in past visits to CAC's clubs, which precluded her from becoming a member, and therefore cancelled the appointment.

¶ 7     Petitioner advised the investigator she had never received any complaints regarding her disruptive behavior at CAC's clubs. Petitioner also stated that, while no one made any comments to her about race, she believed that Strobel "felt threatened to see her become a member of a club in a nice location and felt threatened of her high standards."

¶ 8     Petitioner stated she engaged in a protected activity when, after speaking with Strobel, on March 7, 2018, she sent a letter to CAC's owner, Pat Cunningham, complaining about Strobel's discrimination against her. According to petitioner, after CAC received her letter, CAC "began retaliating against her and did not allow her to become a member of the facility." She advised the investigator that, "because she is light-skinned, half-white English American, her face tends to be envied by women regardless of color or race," and that she believed CAC was "jealous of her because of her high standards."

¶ 9     Kreissl informed the investigator her position as CAC's director of customer service encompassed each of CAC's Chicago locations, including the Evanston club. Her responsibilities included, *inter alia*, handling "escalated customer issues." Kreissl stated that CAC is a private facility which anyone is welcome to visit. On June 7, 2017, petitioner signed up for a 30-day

membership to the Webster club pursuant to a Groupon offer. The membership agreement for the Groupon offer required members to conduct themselves in a manner that does not disturb or impair the use and enjoyment of the club by any other members or guests. The agreement also prohibited the use of foul, loud, and abusive language. The agreement further provided that violation of the personal conduct rules may result in removal or forfeiture of club privileges.

¶ 10     While petitioner was at the Webster club, CAC's employees noted she exhibited strange behavior in the locker room and at the front desk. For example, one employee observed petitioner in the women's locker room yelling, making strange noises, and contorting her face. Petitioner also had plastic bags full of personal items strewn about the locker room. No CAC employee spoke to petitioner about her behavior, but an employee noted petitioner was known for being disruptive in other establishments in the area.

¶ 11     In July 2017, petitioner redeemed a one-week pass and, in September and October 2017, purchased one-day guest passes for use at the Evanston club. Petitioner again visited the Evanston club on March 6, 2018, and within 20 minutes of her arrival, CAC began receiving complaints from its members that petitioner was pacing and talking to herself in the locker room, making the members feel uncomfortable. Another member complained petitioner was making loud, disturbing noises while using the treadmill and expressed concern to CAC that petitioner had been in other establishments in the area behaving disruptively.

¶ 12     Later that day, petitioner called to schedule a meeting with Strobel to proceed with an annual contract and membership. CAC staff met to discuss petitioner's behavior on the prior occasions and review her account notes, which contained summaries of her prior visits to CAC's clubs. After the meeting, Kreissl concluded petitioner would be unable to abide by CAC's

membership agreement and that her disruptive behavior would have an impact on other guests' use and enjoyment of CAC's facilities. Though Strobel was "not in a position to decide who [was] denied membership," Kreissl instructed Strobel to call petitioner later that day and inform her CAC would not offer her a membership in its clubs.

¶ 13 Kreissl also recounted for the investigator five occasions on which CAC had made the determination to restrict or terminate membership to its facilities based on violations of its membership agreement, standards, and bylaws, including disruptive behavior, use of profane language, and inappropriate conduct. Kreissl stated petitioner's race had no bearing on her decision to prohibit petitioner from joining CAC's clubs.

¶ 14 Kreissl further stated that, on March 7, 2018, petitioner began calling CAC's facilities trying to locate Cunningham and also sent a note to him in which she threatened to file a discrimination claim "if he failed to remove a false remark on her guest file notes." The letter also accused CAC and its employees of jealousy and resentment of petitioner based upon her race.

¶ 15 The investigator found no evidence petitioner was denied full and equal enjoyment of CAC's facilities based on her race or in retaliation and recommended a finding of lack of substantial evidence as to both counts of her charge. With respect to the discrimination claim, the investigator noted petitioner had conceded there were no comments made to her regarding her race. The investigator found CAC's decision to deny petitioner membership was not based on her race but rather was based on CAC's determination petitioner would be unable to abide by the membership agreement given her past disruptive behavior and its negative impact on CAC's members' and guests' use and enjoyment of its facilities. Additionally, the investigator found petitioner failed to name a similarly situated non-black individual who was treated better in a

similar situation. With respect to the retaliation claim, the investigator found there was no evidence CAC denied petitioner a membership in retaliation for her engagement in a protected activity because the alleged retaliatory action—denial of membership—preceded petitioner's alleged protected activity—her submission of a complaint to CAC's owner.

¶ 16    The Department dismissed petitioner's charge for lack of substantial evidence, and petitioner sought review from the Commission. In her request for review, petitioner asserted her charge "was not suppose[d] to be discharged," and requested remand to the Department because the investigator treated her disrespectfully during the fact-finding conference. She alleged that, during the fact-finding conference, she was offered a settlement despite the fact that she had previously told the Department she did not wish to engage in mediation.  She further contended that the investigator's determination was "a very racist one," and despite her "excellent credibility," CAC lied about petitioner's past behavior at its clubs, and Kreissl "lied to discredit her [f]irst class American half black and White [E]nglish liter [*sic*] skin status." She also contended that CAC and the Department violated her public accommodation rights, her request not to agree to mediation, and took advantage of her *pro se* status by failing "to comply to the court enforced demand." Finally, she asserted the "white respondents and [the Department investigator] are liable for [her] requested demand of $50,000."

¶ 17    The Department filed a response in which it argued petitioner failed to establish a *prima facie* case of public accommodation discrimination or retaliation. With respect to the discrimination claim, the Department argued petitioner failed to identify a similarly situated individual, not within her protected class, who was permitted full enjoyment of CAC's facilities. According to the Department, a similarly situated individual "would be a non-black patron, who

was accused of engaging in disruptive behavior during past visits at [CAC's facilities], and who was not subsequently denied membership by [CAC]." Additionally, the Department argued there was no evidence of race-based animus and no nexus between CAC's actions and petitioner's race. Further, the Department argued there was no evidence that CAC's articulated nondiscriminatory reason for denying petitioner membership—her past disruptive behavior, employee reports, and member complaints—was a pretext for discrimination and that CAC had a good-faith belief in its decision to do so.

¶ 18    With respect to the retaliation claim, the Department argued petitioner failed to establish a *prima facie* case of retaliation because the alleged retaliatory act—denial of membership—preceded petitioner's alleged protected activity—sending a letter to the owner of CAC. In addition, as it did with respect to the discrimination claim, the Department argued CAC had a good-faith belief in its decision to deny petitioner membership.

¶ 19    With respect to petitioner's allegations that the Department should not have dismissed her charge because she was treated disrespectfully by the investigator, the Department contended it followed its procedures, conducted a full investigation, and made findings based on the evidence presented.

¶ 20    In her reply, petitioner repeated many of the arguments set forth in her request for review. In addition, she asserted she had set forth a *prima facie* case of public accommodation discrimination because she "was the only minority black female patron that Kellen Strobel (white male) had denied her the full and equal enjoyment of [CAC's] facility, and was retaliated against by the white management and President, Pat Cunningham, for reporting them to the IDHR for failure to accommodate her race, black as an ethical patron that never violated any fitness facility

policy." Further, she argued "the non-black patrons were clearly favored by the all white management and staff," as she was the "only black minority that was racially disparaged as a credible patron." She also asserted that CAC admitted "that [it] had refused [petitioner] based on her race, black in response to her filed charge on March 19, 2018." She also argued that if CAC's allegations of her past disruptive behavior were true, "the white staff would have confronted her, prior to the first time complaint she received via phone by Kellen Strobel and white male, on March 14, 2018, when she was due to enroll in the promotional offer received via email, prior to the scheduled appointment." Further, she asserted the Department investigator, a "white female," disrespected her during the fact-finding conference by passing out an "extension form" which she knew in advance petitioner would not agree to. According to petitioner, the investigator responded with an unprofessional attitude and rudeness in front of CAC's representatives.

¶ 21    On September 10, 2019, the Commission entered an order sustaining the Department's dismissal of petitioner's charge of discrimination. With respect to the discrimination claim, the Commission concluded petitioner failed to establish a similarly situated individual outside her protected class was treated more favorably, as she did not identify any persons outside her class who were accused of disruptive behavior but still allowed to become members. With respect to the retaliation claim, the Commission concluded petitioner failed to establish a causal connection between her protected activity and the adverse action because CAC's denial of membership occurred before she complained of unlawful discrimination. On September 18, 2019, petitioner filed a petition for direct review of the Commission's order in this Court. See Ill. S. Ct. R. 335(a) (eff. July 1, 2017); 775 ILCS 5/8-111(B)(1) (West 2018) (After the Commission has entered a

final order, a complainant may obtain judicial review by filing a petition for review in the Appellate Court within 35 days of the decision.).

¶ 22     On appeal, petitioner contends the Commission erred by (1) "dismissing the evidence for refusing [her] membership, (i.e.) cited in the CAC white male management response to [her charge of discrimination]"; and (2) "failing to remand [her] charge, based on the [Department] investigator's negligence in fact-finding conference, (i.e.) allowing mediation extension request, that [she] never agreed."

¶ 23     As an initial matter, we note petitioner's briefs on appeal fail to comply with many of the requirements of Illinois Supreme Court Rule 341, which governs the content of appellate briefs. For example, the statement of facts in her opening brief does not contain all of the facts necessary to an understanding of the case and contains argument. Ill. S. Ct. R. 341(h)(6) (eff. May 25, 2018). Moreover, petitioner has failed to set forth any "Points and Authorities" statement in her opening brief outlining the points argued and authorities relied upon, and her briefs are devoid of any citation to legal authority with the exception of two general citations to the Act. See Ill. S. Ct. R. 341(h)(1), (7) (eff. May 25, 2018). In addition, the appendix to her brief contains nearly the entire record, many duplicate attachments, and is not consecutively paginated. See Ill. S. Ct. R. 342 (eff. Oct. 1, 2019).

¶ 24     Petitioner's status as a *pro se* litigant does not excuse her compliance with the supreme court rules governing appellate briefs. *Gillard v. Northwestern Memorial Hospital*, 2019 IL App (1st) 182348, ¶ 45. The supreme court rules are not suggestions, and we have the discretion to strike a party's brief and dismiss an appeal for failure to comply with the rules. *McCann v. Dart*, 2015 IL App (1st) 141291, ¶ 12. However, because it is clear from petitioner's brief that she

challenges the Commission's final order and we have the benefit of cogent briefs from both CAC and the Commission, we will not strike her brief but instead consider the merits of her appeal.

¶ 25    The Act provides it is "a civil rights violation for any person on the basis of unlawful discrimination to *** [d]eny or refuse another the full and equal enjoyment of the facilities, goods, and services of any public place of accommodation." 775 ILCS 5/5-102(A) (West 2018). "Unlawful discrimination" includes discrimination against a person because of her race. *Id.* § 1-103(Q).

¶ 26    A case under the Act is commenced when an aggrieved party files a written charge of discrimination with the Department. *Id.* § 7A-102(A)(1). The Department then investigates the charge to determine whether there is substantial evidence that the alleged civil rights violation has been committed. *Id.* § 7A-102(C), (D)(2). "Substantial evidence is evidence which a reasonable mind accepts as sufficient to support a particular conclusion and which consists of more than a mere scintilla but may be somewhat less than a preponderance." *Id.* § 7A-102(D)(2). If the Department finds there is no substantial evidence the Act has been violated, the charge is dismissed. *Id.* § 7A-102(D)(3). The charging party may then commence an action in the circuit court or, as petitioner did here, file with the Commission a request for review. *Id.*

¶ 27    "When a request for review is properly filed, the Commission may consider the Department's report, any argument and supplemental evidence timely submitted, and the results of any additional investigation conducted by Department in response to the request." *Id.* § 8-103(B). A party may seek judicial review of the Commission's final order by filing a petition for review in this Court. *Id.* § 8-111(B)(1).

¶ 28 We review the final order of the Commission, not the Department's decision. *Zaderaka v. Illinois Human Rights Commission*, 131 Ill. 2d 172, 180 (1999). We review the order sustaining the dismissal of a discrimination charge for lack of substantial evidence under an abuse of discretion standard. *Young v. Illinois Human Rights Commission*, 2012 IL App (1st) 112204, ¶ 32. Under this standard, we will not disturb the Commission's decision unless it is arbitrary or capricious. *Id.* ¶ 33. "A decision is arbitrary or capricious if it contravenes legislative intent, fails to consider a critical aspect of the matter, or offer[s] an explanation so implausible that it cannot be regarded as the result of an exercise of the agency's expertise." *Id.* We must sustain the Commission's factual findings "unless the court determines that such findings are contrary to the manifest weight of the evidence" (775 ILCS 5/8-111(B)(2) (West 2018)), and we will not reweigh the evidence or substitute our judgment for that of the Commission (*Young*, 2012 IL App (1st) 112204, ¶ 33).

¶ 29 The prohibition against public accommodation discrimination set forth in the Act is similar to that set forth in Title II of the Civil Rights Act of 1964 (42 U.S.C. § 2000a (2000)), which protects an individual's "full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodation *** without discrimination or segregation on the ground of race, color, religion, or national origin." Illinois courts therefore routinely seek guidance from federal decisions when analyzing discrimination actions brought under the Act. *Zaderaka*, 131 Ill. 2d at 178-89. Because petitioner provided no direct evidence of discrimination, she was required to provide indirect evidence of discrimination by satisfying the three-part test set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Zaderaka*, 131 Ill. 2d at 178-79.

¶ 30    Under this three-part test, the complainant must first establish by a preponderance of the evidence a *prima facie* case of unlawful discrimination. *Id.* If a *prima facie* case is established, a rebuttable presumption arises that the respondent unlawfully discriminated against the complainant. *Id.* at 179. Second, to rebut the presumption, the respondent must articulate, but need not prove, a legitimate, nondiscriminatory reason for its decision. *Id.* If the respondent carries its burden of production, the presumption of unlawful discrimination is extinguished, and the complainant must then prove by a preponderance of the evidence that the respondent's articulated reason was not its true reason but, rather, a pretext for unlawful discrimination. *Id.* The ultimate burden remains at all times on the complainant. *Id.*

¶ 31    To establish a *prima facie* case for public accommodation discrimination, petitioner was required to show she (1) is a member of a protected class; (2) attempted to exercise her right to full benefits and enjoyment of a place of public accommodation; (3) was denied those benefits and enjoyment; and (4) was treated less favorably than similarly situated persons outside her protected class. *McCoy v. Homestead Studio Suites Hotels*, 390 F. Supp. 2d 577, 583-85 (S.D. Tex. 2005).

¶ 32    After reviewing the record, we conclude the Commission did not abuse its discretion by finding petitioner failed to establish a *prima facie* case of public accommodation discrimination based on her race. The record shows petitioner failed to present any evidence showing she was treated less favorably than similarly situated persons outside her protected class. Indeed, petitioner did not present evidence of a single person who engaged in disruptive behavior, leading to concerns and complaints from CAC employees, members, and guests, and was permitted to become a member of any CAC facility. Because petitioner did not establish a *prima facie* case of public accommodation discrimination, the burden never shifted to CAC to rebut the presumption of

discrimination by articulating a legitimate, nondiscriminatory reason for its decision. See *Zaderaka*, 131 Ill. 2d at 179.

¶ 33 Even if petitioner had established a *prima facie* case, CAC in this case articulated a legitimate, nondiscriminatory reason for its decision to deny petitioner membership. Here, the record shows petitioner was denied membership as a result of her disruptive behavior on her previous visits to CAC's facilities and CAC's conclusion that petitioner would not be able to abide by its membership agreement. At the fact-finding conference, Kreissl stated that petitioner's race had nothing to do with its denial of her membership. Rather, CAC's decision was based on her behavior at its facilities, from which it determined petitioner would not be able to abide by CAC's membership agreement.

¶ 34 We likewise conclude the Commission did not abuse its discretion by finding petitioner failed to establish a *prima facie* case of retaliation. The Act provides that it is a civil rights violation to "[r]etaliate against a person *** because he or she has made a charge, filed a complaint, testified, assisted, or participated in an investigation, proceeding, or hearing under [the] Act." 775 ILCS 5/6-101(A) (West 2017). To establish a *prima facie* case of retaliation, the complainant must show (1) he or she engaged in a protected activity; (2) the place of public accommodation committed an adverse act against the petitioner; and (3) a causal connection existed between the protected activity and the adverse act. See *Welch v. Hoeh*, 314 Ill. App. 3d 1027, 1035 (2000). "The Commission and the courts have required that the adverse act *follow* the protected activity in order to raise the necessary inference of a causal connection." (Emphasis added.) *In the Matter of Request for Review By: Frank L. Amato, Petitioner*, Ill. Hum. Rts. Comm'n Order, 2017CR1388, *2 (Mar. 6, 2020).

¶ 35    Here, petitioner failed to establish any causal connection between her protected activity and the adverse action taken by CAC. The record shows the Commission found petitioner called CAC to set up an appointment to discuss full-time membership but, on March 6, 2018, a CAC employee called petitioner, cancelled the appointment, and told her she would not be able to sign up for membership because of her past disruptive behavior at CAC's facilities. It further found petitioner wrote a letter to CAC's owner complaining of racial discrimination after being denied membership.

¶ 36    The Commission's findings were supported by the evidence presented at the fact-finding conference. Petitioner advised the investigator that she received a promotional offer by email in early March 2018 and called CAC to set an appointment for March 14, 2018, to discuss membership options. She further stated that, on March 6, 2018, she received a phone call from Strobel, who cancelled the appointment and informed her she would not be permitted membership due to her past disruptive behavior. Petitioner then sent a letter to Cunningham, on March 7, 2018, in which she complained of Strobel's alleged discrimination against her. Kreissl confirmed petitioner's version of events, stating CAC's employees held a meeting to discuss petitioner's past behavior and she directed Strobel to call petitioner, on March 6, 2018, to inform her CAC would not permit her to become a member. Based on this evidence, the Commission properly found petitioner could not establish a *prima facie* case of retaliation, as the adverse action preceded the protected activity. See *id.*

¶ 37    Petitioner argues CAC's "white male management" admitted in its response to her charge that she was the only minority that was refused membership. In support of her argument, she relies upon CAC's answer to her charge of discrimination, which she attached as an exhibit to her Rule

335 petition in this Court, which is also appended to her brief, but is not included in the record on appeal. Because CAC's answer to her charge is not included in the record on appeal and a Rule 335 petition is not the proper vehicle to supplement the record, we are unable to consider it. See *People v. Heaton*, 266 Ill. App. 3d 469, 476 (1994) (reviewing court may not consider matters not in the record, and attachments to filings in the reviewing court cannot be used to supplement the record); Ill. S. Ct. R. 329 (eff. July 1, 2017).

¶ 38    Petitioner further argues she established a *prima facie* case of both discrimination and retaliation, as she was "a responsible black customer, that was treated less than the non-blacks, since the management was all white." As discussed above, the Commission properly found she failed to establish *prima facie* cases of discrimination and retaliation based on the evidence presented to the Department investigator. Her conclusory assertion that she was treated "less than the non-blacks" does not change that conclusion where she failed to identify a similarly situated individual who was treated more favorably than her and failed to establish a causal connection between the adverse action and her protected activity.

¶ 39    Finally, with respect to her retaliation claim, petitioner argues the adverse action occurred on March 14, 2018, as that was the date she had an appointment to discuss with Strobel her membership options and, despite CAC's allegation that Strobel called her on March 6, 2018, to deny her membership, she never "received [it] on her voicemail." Her argument is not supported by the record. Petitioner's own statement at the fact-finding conference indicates she did, in fact, receive Strobel's phone call on March 6, 2018, and Kreissl's statement confirmed this fact. Accordingly, we reject petitioner's argument that the adverse action did not occur until March 14, 2018.

¶ 40     Petitioner also contends the Commission erred by "failing to remand [her] charge, based on the investigator's negligence in [the] fact[-]finding conference, (*i.e.*), allowing [a] mediation extension request that [she] had never agreed to." Further, petitioner argues the investigator acted rudely and "violated [her] public accommodation rights as an ethical IDHR complainant and based on her race, black." We are not persuaded by these arguments.

¶ 41     First, we note that, other than petitioner's unsupported allegation, the record does not contain any indication that the Department investigator acted rudely toward petitioner or asked her to sign a mediation extension request despite her prior election to forego mediation. Moreover, petitioner has failed to offer any citation to authority to support her argument that the investigator violated the Department's procedures in doing so. Nor has she offered any argument relating to the investigator's alleged violation of her civil rights other than her baseless, conclusory allegation that finds no support in the record and does not describe how it would undermine or invalidate the Commission's findings. For these reasons alone, we reject her arguments. See *Olive Portfolio Alpha, LLC v. 116 West Hubbard Street, LLC*, 2017 IL App (1st) 160357, ¶ 42.

¶ 42     In sum, the Commission properly sustained the Department's dismissal of petitioner's charges for lack of substantial evidence where petitioner failed to establish *prima facie* cases of public accommodation discrimination and retaliation. Additionally, petitioner failed to show any defect in the fact-finding conference which would undermine or invalidate the Commission's findings.

¶ 43     For the reasons stated, we affirm the Commission's order sustaining the Department's dismissal of petitioner's charge for lack of substantial evidence.

¶ 44     Affirmed.